UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CIVIL ACTION NO. 5:15-CV-00007-TBR

ROBBIE EMERY BURKE, ADMINISTRATOR                         Plaintiff
OF THE ESTATE OF JAMES KENNETH EMBRY

v.

LADONNA THOMPSON, *et al.*                                Defendants

## MEMORANDUM OPINION AND ORDER

This matter comes before the Court on motions to dismiss filed by Defendants James Erwin and LaDonna Thompson (DN 106) and Deborah Coleman and Cookie Crews (DN 109). Plaintiff filed a consolidated response. (DN 114). Defendants have replied. (DN 116, 121). For the following reasons, Defendants' motions are GRANTED.

## BACKGROUND

This action arises out of the death of James Kenneth Embry while he was an inmate at the Kentucky State Penitentiary ("KSP"). Embry died of starvation and dehydration after refusing thirty-five of his final thirty-six meals. Following his death, the Kentucky Department of Corrections conducted a Critical Incident Review which concluded that Embry's death "occurred as a result of a systemic failure at the Kentucky State Penitentiary." (DN 105-1, p. 19). At this stage the Court "must accept all of the allegations in the complaint as true, and construe the complaint liberally in favor of the plaintiff." *Lawrence v. Chancery Court of Tenn.*, 188 F.3d 687, 691 (6th Cir. 1999) (citing *Miller v. Currie*, 50 F.3d 373, 377 (6th Cir. 1995)). The Court will also consider the Critical Incident Review attached to Plaintiff's complaint. *Rondigo, L.L.C. v. Twp. of Richmond*, 641 F.3d 673, 680-81 (6th Cir. 2011) ("a court may consider exhibits

1

attached to the complaint, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the complaint and are central to the claims contained therein, without converting the motion to one for summary judgment") (citation and punctuation omitted).

Embry was a 57-year-old inmate serving a nine-year sentence after being convicted of drug possession, assault, and wanton endangerment. Embry had a history of mental illness and had been prescribed various medications while at KSP. Embry was also disruptive, having "no less than 25 major disciplinary violations." (DN 105-1, p. 3). This disruptive pattern ceased on June 22, 2012. On that date Embry was assaulted by another inmate. The assault, which required Embry be transported to a local hospital for medical care, appeared to have a major impact on Embry. Embry received no further disciplinary reports until shortly before his death, when he was cited multiple times for failing to eat and harming himself. Embry was fearful and believed there was a "contract" on his life. (DN 105-1, p. 4).

Embry was prescribed various medications for his mental health while he was on inmate. On May 7, 2013, Embry informed the medical staff that he did not like how these medications made him feel and would no longer take certain medications. Gingy Grider, an advanced registered nurse practitioner ("APRN"), eventually discontinued all of Embry's medication on July 22, 2013, after refused to take any medication for two weeks.

Embry continued to fear for his own safety and on November 29, 2013, he was moved to a segregation unit, Cellhouse Three. On December 3, Embry told Dr. Jeane Hinkebein, a psychologist at KSP, that he wanted to return to his medication. Embry was "anxious and paranoid" and believed he "could not take it on the yard." (DN 105-1, p. 4). Embry also

repeatedly made statements about wanting to harm himself. Dr. Hinkebein and Psychological Associate Losser discounted these claims and concluded Embry's actions were goal-driven to influence where Embry would be housed. Embry saw Losser again on December 5. Embry repeated his concerns about his paranoia and again requested to return to his medication. Losser informed Embry that "medication is typically not initiated in segregation" and denied his request. (DN 105-1, p. 6). Embry was put on a 15-minute watch and put into a suicide smock due to statements he made to staff.

On December 7, Embry refused his breakfast and lunch trays, taking only his dinner tray. This began a pattern of Embry refusing at least a portion of his daily meals. On December 9, Embry was seen by Losser. Embry claimed he did not have "anything to live for." (DN 105-1, p. 7). However, Losser reported that Embry had no thoughts of self-harm. The following day, Embry began banging his head on his cell door. Embry was placed in a restraint chair and then moved to Seven Cellhouse for observation. Embry continued to claim he had nothing to live for and refused a portion of his daily meals. Dr. Hinkebein discounted Embry's statements because they were vague and he presented no defined plan for harming himself. (DN 105-1, p. 7).

On December 11, 2013, Embry was observed scratching his right forearm with a spork. Embry was ordered to stop and back towards the door to be handcuffed. Embry refused. The responding officer again ordered Embry to back towards the door to be handcuffed. Embry again refused. The Unit Supervisors pepper-sprayed Embry. Embry was placed on constant watch and seen by Dr. Hinkebein. Dr. Steve Hiland, the facility physician at KSP, and Bob Wilkinson, an advanced registered nurse practicioner ("ARNP"), were notified of the incident.

For the next nine days, Embry continued to periodically refuse meals and claim he wanted to hurt himself. On December 20, 2013, Embry began banging his head on his cell door once again. He was restrained, placed on constant watch, and visited by Dr. Hinkebein. Embry stated: "I felt like hurting myself, so I banged my head." (DN 105-1, p. 7).

For the next week Embry continued to miss periodic meals. On December 27, 2013, Embry received a disciplinary report for missing four consecutive meals. Three days later he told Losser that he did not have a reason to live. On January 2, 2014, Embry missed all three meals. Dr. Hinkebein observed that Embry "wants to stay in the observation cell and appears comfortable there." Dr. Hinkebein recommended that Embry be moved to Three Cellhouse. (DN 105-1, p. 8).

On January 3, 2014, Embry was moved to Three Cellhouse. He refused all three meals and was placed on hunger strike watch. Gloria Lewis, a licensed practical nurse ("LPN"), noted that Embry has missed four consecutive meals. Dr. Hinkebein noted that, despite Embry's claim that he will harm himself, he has still not formulated a plan for doing so. Embry received another disciplinary report for missing meals.

On January 4, Embry refused all three meals. The Unit Supervisors notified Jim Royster, a registered nurse ("RN"), who performed a vitals check. Royster observed that Embry was "weak and shaky" and advised Embry to resume eating. Embry responded that it "has been too long to resume now." (DN 105-1, p. 8). Embry's weight was recorded at 132 pounds; 32 pounds less than he weighed in September, 2013.

On January 5, Embry refused all three meals. Embry did accept and drink tea during the evening. Hope Gresham, an LPN, "instruct[ed] that due to him drinking, the hunger strike is

4

ended." (DN 105-1, p. 9). Another LPN, Lori Secoy, noted that Embry has missed eleven consecutive meals. Embry refused all three meal trays on January 6.

On January 7, Embry refused his breakfast and lunch trays but drank juice at lunch and accepted a cookie and two cups of tea in the evening. Losser visited Embry, who stated he had just not been hungry. The following day Embry again refused all three meal trays, but did accept two cups of tea. Losser observed that Embry was "doing okay" and removed him from watch status. (DN 105-1, p. 9). On January 9, Embry accepted his breakfast tray and refused his lunch and dinner tray. The following day he refused all three trays, taking only juice in the morning. On January 11, he again refused all three trays. Embry received his third disciplinary report for not eating. On January 12, Embry refused all three trays. Lewis, an LPN, noted her concern about Embry's disinterest in eating or drinking.

Embry passed away on the evening of January 13, 2014. Embry refused all three meals offered that day. On the morning of January 13 the Security Count Office contacted Josh Patton, a Correctional Unit Administrator ("CUA"), and informed him that Embry would be moved to the infirmary. Bruce Bauer, an RN, had authorized the move due to Embry's refusal to eat. Patton informed Bauer that Embry has accepted a drink and asked if Embry should still be moved. The two consulted Wilkinson, an APRN. Wilkinson instructed them that Embry should not be moved to the infirmary and should be taken off of the hunger strike. (DN 105-1, p. 10). Wilkinson later claimed he tried to move Embry to the infirmary on January 13, "but 'they' wouldn't bring him." (DN 105-1, p. 16). "He then went on to add that he often can't get inmates out to be seen because Security won't bring them. (DN 105-1, p. 16). The Critical Incident Review notes that Wilkinson's claim "was clearly contradictory to the statements of virtually every other staff member interviewed." (DN 105-1, p. 16).

5

At approximately 5:04 that evening, Officer Brian Thomas was making rounds when he stopped outside Embry's cell. Thomas noted that Embry was sitting on his toilet and was unresponsive. Thomas called for his supervisor and medical staff. His supervisor, Randy Robinson, ordered the cell door opened. Robinson, Thomas, and Officer Bolton checked Embry and could not locate a pulse. Embry's "eyes were open and fixed." (DN 105-1, p. 2). LPN Gresham arrived and began to attempt resuscitation. EMT members arrived and also attempted to revive Embry, unsuccessfully. An autopsy concluded that Embry died from "dehydration with contributing starvation, duodenal ulcer, and emphysema with right ventricle hypertrophy." (DN 105-1, p. 6). Embry weighed 120 pounds, having lost 44 pounds in five months.

Following Embry's death, the Kentucky Department of Corrections ("KDOC") conducted a Critical Incident Review. This comprehensive review included interviewing twenty employees including the warden, medical staff, mental health staff, and correctional officers. The KDOC also reviewed activity sheets, meeting minutes, video footage, policies and protocols, and toured the cellhouses. The KDOC concluded that "the death of Inmate James Embry occurred as a result of a systemic failure at the Kentucky State Penitentiary involving many interacting issues." Among the problems noted by the KDOC were:

- "inadequate staffing," as only seven nurses were on staff whereas a normal rotation would require twelve nurses (DN 105-1, p. 13);
- a daily schedule that began at 2:00 a.m., giving inmates little time for uninterrupted sleep (DN 105-1, p. 12);
- sick call being conducted beginning at 5:00 a.m., with inmates only being seen if they are "standing at their cell door" with a "completed and signed money slip for the associated copay" when the Physician passes (DN 105-1, p. 12);

6

- the Physician "made no effort to look into any of the cells" and the accompanying nurses "appeared to be completely disengaged from the process" (DN 105-1, p. 13);

- Correctional officers performing rounds so quickly that they "spend little time actually on the segregation walks dealing with and see inmates face to face," resulting in "[n]one of the Program staff" having any "significant contact with Inmate Embry during his last 46 days in segregation" (DN 105-1, p. 11);

- weekly management meetings[1] meant to discuss inmates' mental health instead focused on behavioral issues, resulting in "[n]one of the staff" being able to recall Embry being discussed and the report "[n]othing new noted" listed next to Embry's name at a time when he had missed twenty-three of his last twenty-four meals (DN 105-1, p. 14).

- the assault on Embry which triggered his request to be placed in a segregation unit was not investigated, even though policy required an investigation (DN 105-1, p. 10);

- an "unwritten policy" that inmates who enter segregation were not evaluated for or prescribed psychotropic medications (DN 105-1, p. 15);

- the lack of a clear definition of what constitutes a hunger strike in either the Health Service Protocol ("HSP") or Medical Standing Orders ("MSO") (DN 105-1, p. 14);

---

[1] These meetings were allegedly attended by Defendants Duke Pettit, John Wood, Josh Patton, Hobert Huddleston, Bruce Von Dwingelo, Adam Noles, Gingy Grider, and other medical staff. (DN 105).

- while the HSP and MSO "are very clear as to how a hunger strike is to be managed once declared. . . . most staff stated they were unfamiliar with the MSO's or the HSP although they indicated they knew they existed" (DN 105-1, p. 15);

- "all of the Nurses interviewed stated that they have been directed not to follow the MSO's and to call the facility Physician" instead, which was a "directive enforced by both the APRN and the facility Physician himself." (DN 105-1, p. 17).

Plaintiff alleges that the KDOC's investigation was not the first warning sign that there was a "culture of indifference" at the Kentucky State Penitentiary. (DN 105). Plaintiff alleges that in 2011, a KSP inmate named Clifford Warfield died after being classified as on hunger strike. Warfield had a documented history of bowel obstructions and did not eat or drink for five days. While KSP staff believed Warfield was malingering, his intestines were turning gangrenous, ultimately leading to his death. Plaintiff believes that other similar incidents have occurred. (DN 105).

## PROCEDURAL HISTORY

This action was initially filed as two separate lawsuits. Mark Pfeifer was appointed the administrator of Embry's estate in Daviess County and filed a case on January 12, 2015. *Pfeiffer v. Thompson*, 5:15-CV-00007. Robbie Emery Burke was appointed the administrator of Embry's estate in Lyon County and filed a case on January 15, 2015. *Burke v. Correct Care Solutions, LLC*, 5:15-CV-00015. The Daviess County case has been amended to name Ms. Burke the administrator. The Court has consolidated these cases. (DN 86).

The Court now considers two motions to dismiss. The first motion to dismiss was filed by LaDonna Thompson, Commissioner of the KDOC and James Erwin, Deputy Commissioner of the KDOC. (DN 106). The second motion was filed by Cookie Crews, the Health Services Administrator of the KDOC, and Deborah Coleman, the Mental Health Director of the KDOC. (DN 109). Plaintiff refers to these parties[2] collectively as the "Frankfort-Based Defendants" and the Court will do the same.

### STANDARD

"When considering a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the district court must accept all of the allegations in the complaint as true, and construe the complaint liberally in favor of the plaintiff." *Lawrence v. Chancery Court of Tenn.*, 188 F.3d 687, 691 (6th Cir. 1999) (citing *Miller v. Currie*, 50 F.3d 373, 377 (6th Cir. 1995)). Denial of the motion is proper "unless it can be established beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Achterhof v. Selvaggio*, 886 F.2d 826, 831 (6th Cir.1989) (citing *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)). Nonetheless, unwarranted factual inferences or legal conclusions masquerading as fact will not prevent a motion to dismiss. *Blakely v. United States*, 276 F.3d 853, 863 (6th Cir. 2002). A "complaint must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under some viable legal theory." *Andrews v. Ohio*, 104 F.3d 803, 806 (6th Cir. 1997) (citing *In re DeLorean Motor Co.*, 991 F.2d 1236, 1240 (6th Cir. 1993)).

"Although a motion pursuant to Rule 12(b)(6) invites an inquiry into the legal sufficiency of the complaint, not an analysis of potential defenses to the claims set forth therein, dismissal

---

[2] Doug Crall, the Medical Director of the KDOC, is the fifth Frankfort-Based Defendant. (DN 105). However, Crall has not entered an appearance in this case and the Court has not considered the claims against Crall in this analysis.

nevertheless is appropriate when the defendant is entitled to a meritorious affirmative defense such as qualified immunity." *Peatross v. City of Memphis*, 2016 WL 1211916, at *4 (6th Cir. Mar. 29, 2016). This is because qualified immunity is an "*immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." (emphasis in original) *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). "Thus, in a suit against government officials for an alleged violation of a constitutional right, the court—not the jury—must consider the 'threshold question' of whether 'the facts alleged show the officer's conduct violated a constitutional right.'" *Phillips v. Roane Cty., Tenn.*, 534 F.3d 531, 539 (6th Cir. 2008) (*quoting Saucier v. Katz*, 533 U.S. 194, 202 (2001).

## DISCUSSION

Plaintiff alleges that the Frankfort-Based Defendants violated Embry's constitutional rights pursuant to 42 U.S.C. § 1983 by showing deliberate indifference to Embry's serious medical needs and by failing to train or supervise staff. The Frankfort-Based Defendants move to dismiss Plaintiff's § 1983 against them on the grounds that they are protected by qualified immunity.

Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Feathers v. Aey*, 319 F.3d 843, 847-48 (6th Cir. 2003) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Courts employ a two-part inquiry to determine whether a defendant is entitled to qualified immunity: (1) the plaintiff must have alleged sufficient facts to show a constitutional violation; and (2) the right at issue must have been "clearly established" at the time of the alleged violation. *Campbell v. City of Springboro, Ohio*, 700 F.3d 779, 786 (6th Cir. 2012). The Court may, in its discretion, decide which of these two inquiries is addressed

first in light of the circumstances of the particular case at hand. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (refining *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). "[I]f either one is answered in the negative, then qualified immunity protects the official from civil damages." *Brown v. Chapman*, 814 F.3d 447 (6th Cir. 2016). When a defendant raises the defense of qualified immunity, the plaintiff bears the burden of showing that the defendant is not entitled to it. *Austin v. Redford Twp. Police Dep't*, 690 F.3d 490, 496 (6th Cir. 2012). (*citing Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006)).

Plaintiff alleges that the Frankfort-Based Defendants are liable under two theories. First, Plaintiff claims the Frankfort-Based Defendants violated Embry's Eighth Amendment right to be free from cruel and unusual punishment in violation of 42 U.S.C. § 1983. Plaintiff also claims that the Frankfort-Based Defendants are liable as supervisors who implemented policies which posed an excessive risk to the health and safety of inmates. (DN 105). The Court will first address (I) the Frankfort-Based Defendants' qualified immunity defense with regards to Plaintiff's Eighth Amendment claim. The Court will then address (II) Plaintiff's supervisory liability claim.

**I.     Eighth Amendment Right to Be Free From Cruel and Unusual Punishment.**

Plaintiff claims that all defendants, including the Frankfort-based Defendants, violated Embry's right under the Eighth Amendment to be free from cruel and unusual punishment. The Frankfort-Based Defendants argue they are protected by the doctrine of qualified immunity. Qualified immunity applies only if the plaintiff has alleged sufficient facts to show a constitutional violation and the right at issue was clearly established at the time of the alleged violation.     The Court will first address whether (A) Embry had a clearly established

constitutional right before turning to whether (B) Plaintiff has alleged sufficient facts to show a violation of that right.

### A. Clearly Established Constitutional Right.

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S. Ct. 808, 815, 172 L. Ed. 2d 565 (2009) (*quoting Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). A "clearly established" right is one whose "contours" are "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). The requirement that the law be clearly established is designed to ensure that the official "had fair notice that her conduct was unlawful." *Brosseau v. Haugen*, 543 U.S. 194, 198, 125 S. Ct. 596, 599, 160 L. Ed. 2d 583 (2004).

A plaintiff has "two paths for showing that officers were on notice that they were violating a 'clearly established' constitutional right." *Lyons v. City of Xenia*, 417 F.3d 565, 579 (6th Cir. 2005) (quoting *Brosseau*, 543 U.S. at 599). First, a violation may be "shown by the failure to adhere to a particularized body of precedent that squarely governs the case here." *Id*. (citation and punctuation omitted). Second, a violation may be so "obvious under the general standards of constitutional care that the plaintiff need not show a body of materially similar case law." *Id*. (citation and punctuation omitted); *Hope*, 536 U.S. at 741 ("officials can still be on notice that their conduct violates established law even in novel factual circumstances"). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it

would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202.

In this case, Embry had a "right not to have his serious medical needs treated with deliberate indifference." *Williams v. Mehra*, 186 F.3d 685, 691 (6th Cir. 1999); *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). Sixth Circuit precedent clearly establishes that a "detainee's psychological needs may constitute serious medical needs, especially when they result in suicidal tendencies." *Horn by Parks v. Madison Cty. Fiscal Court*, 22 F.3d 653, 660 (6th Cir. 1994) (collecting cases). Additionally, the Sixth Circuit has "long held that prison officials who have been alerted to a prisoner's serious medical needs are under an obligation to offer medical care to such a prisoner. *Comstock v. McCrary*, 273 F.3d 693, 711 (6th Cir. 2001).[3] In this case, Embry's documented mental health issues, request for medicine, open refusal to eat, and deteriorating health were obvious and serious medical needs. Embry had a clearly established constitutional right to have these medical needs addressed.

### B. Sufficient Facts to Show a Violation of That Right.

Having found that Embry had a clearly established constitutional right, the Court turns to whether Plaintiff has alleged sufficient facts to show a violation of that right. "An Eighth Amendment claim has two components, one objective and one subjective." *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001). "To satisfy the objective component, the plaintiff must allege that the medical need at issue is 'sufficiently serious.'" *Id*. (quoting Farmer, 511

---

[3] The Sixth Circuit has not recognized a specific right of a prisoner "to be screened correctly for suicidal tendencies." *Danese v. Asman*, 875 F.2d 1239, 1244 (6th Cir. 1989). This case is distinguishable in that Plaintiff's claim is for Embry's general right to receive appropriate medical care, not a right to have prison officials anticipate and prevent a suicide attempt. *Danese*, 875 F.2d at 1244 ("The general right to medical care, for example, is not sufficient to require a police officer to have known that he had to determine that Danese was seriously contemplating suicide and stop him from following through").

13

U.S. at 834). "To satisfy the subjective component, the plaintiff must allege facts which, if true, would show that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk." *Id*.

### i. Objective Component.

"To satisfy the objective component, the plaintiff must allege that the medical need at issue is 'sufficiently serious.'" *Id*. at 703 (quoting *Farmer*, 511 U.S. at 834). "A serious medical need is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008) (*quoting Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 897 (6th Cir. 2004). A "prison official's act or omission must result in the denial of 'the minimal civilized measure of life's necessities'" *Farmer*, 511 U.S. at 832 (citation omitted) ("prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care").

In this case, even a lay person would easily recognize that Embry's condition required medical attention. At the time of his death Embry has missed thirty-five of his prior thirty-six meals. He had lost 44 pounds in five months. He repeatedly stated he would harm himself. On several occurrences he banged his head against his cell door. Embry was in obvious need of medical help for his mental and physical health. *See e.g. Shadrick v. Hopkins Cty., Ky.*, 805 F.3d 724, 737 (6th Cir. 2015) (finding inmate's MRSA infection, which caused repeated vomiting, diarrhea, open sores, and eventual death, "easily met" the objective component as it was obvious); *Comstock*, 273 F.3d at 703-04 ("Because plaintiff alleges that defendants were

indifferent to Montgomery's psychological needs, namely his suicidal tendency, she easily satisfies the objective component of her constitutional claim")

### ii. Subjective Component.

"To satisfy the subjective component, the plaintiff must allege facts which, if true, would show that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk." *Comstock*, 273 F.3d at 703. "The requirement that the official have subjectively perceived a risk of harm and then disregarded it is meant to prevent the constitutionalization of medical malpractice claims." *Id*.

The subjective component requires "a state of mind more blameworthy than negligence." *Farmer*, 511 U.S. at 835; *Estelle*, 429 U.S. at 105-06 ("an inadvertent failure to provide adequate medical care cannot be said to constitute 'an unnecessary and wanton infliction of pain' or to be 'repugnant to the conscience of mankind'"). It does not, however, require a purposeful intent to cause pain. Instead, "subjective recklessness as used in the criminal law is a familiar and workable standard that is consistent with the Cruel and Unusual Punishments Clause." *Farmer*, 511 U.S. at 839-40. "This state of mind requires that the official consciously disregard a substantial risk of serious harm." (citation and punctuation omitted) *Brooks v. Celeste*, 39 F.3d 125, 128 (6th Cir. 1994). "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842 (citation omitted). "This subjective component 'should be determined in light of the prison authorities'

current attitudes and conduct.'" *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 895 (6th Cir. 2004) (quoting *Helling v. McKinney*, 509 U.S. 25, 36, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993)).

"Each defendant's liability must be assessed individually, based on his or her own actions." *Dorsey v. Barber*, 517 F.3d 389, 399 n. 4 (6th Cir. 2008). Accordingly, the Court must independently consider whether Thompson, Erwin, Crews, or Coleman perceived there was a risk to Embry and disregarded that risk. This analysis is brief, as both the complaint and Critical Incident Review fail to mention the Frankfort-Based Defendants in any capacity other than a supervisory role. Furthermore, Plaintiff concedes she "has no evidence that these Defendants had any direct contact with Mr. Embry." (DN 114). Plaintiff instead seeks to hold these Defendants liable for the policies which led to Embry's death. While this may support a claim for failure to train or supervise, which this Court will address next, these allegations are insufficient to support a claim that these Defendants subjectively perceived and disregarded a risk to Embry. Accordingly, the Court finds that Plaintiff has failed to allege sufficient facts the Frankfort-Based Defendants personally violated Embry's constitutional rights.

## II. Supervisory Liability.

Plaintiff also claims that the Frankfort-Based Defendants are liable in their supervisory capacity. Plaintiff claims the Frankfort-Based Defendants promulgated policies, customs, and practices which led to their subordinates' unconstitutional acts.

The Sixth Circuit "has held that § 1983 liability must be based on more than respondeat superior, or the right to control employees." *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999) (citing *Hays v. Jefferson County, Ky.*, 668 F.2d 869, 874 (6th Cir.1982)). "Thus, a supervisory official's failure to supervise, control or train the offending individual is not

actionable unless the supervisor 'either encouraged the specific incident of misconduct or in some other way directly participated in it.'" *Id*. (citation omitted). "At a minimum a plaintiff must show that the official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." *Id*. "Thus, liability under § 1983 must be based on active unconstitutional behavior and cannot be based upon 'a mere failure to act.'" *Id*. (citing *Salehpour v. University of Tennessee*, 159 F.3d 199, 206 (6th Cir.1998)); *see also Bass v. Robinson*, 167 F.3d 1041, 1048 (6th Cir. 1999) ("In order for liability to attach to Lieutenant Lashbrook for the alleged actions of Officer Robinson, Plaintiff must prove that Lieutenant Lashbrook did more than play a passive role in the alleged violation or showed mere tacit approval of the goings on").

A claim that an official failed to supervise, without more, must be brought against a supervisor in his official capacity, not his individual capacity. "Absent personal involvement in the underlying unconstitutional act, the attempt to hold municipal supervisors liable in their individual capacities for their alleged failure to adequately train employees improperly conflates a § 1983 claim of individual supervisory liability with one of municipal liability." (citation and punctuation omitted) *Dillingham v. Millsaps*, 809 F. Supp. 2d 820, 846 (E.D. Tenn. 2011); *Everson v. Leis*, 556 F.3d 484, 495 (2009); *Farivar v. Ledbetter*, 2012 U.S. Dist. LEXIS 91290 *19 (E.D. Tenn. 2012).

The *Phillips* case illustrates this point. *Phillips v. Roane Cty., Tenn.*, 534 F.3d 531 (6th Cir. 2008). That case arose after Sonya Phillips died from untreated diabetes while awaiting trial for the murder of her infant child. Phillips was found unconscious in her cell and subsequently revived. Although she was swollen, had "purplish" skin, and vomited blood, correctional officers declined to provide her with medical treatment. *Id*. at 536. A contract doctor examined

17

her for six minutes and prescribed Ibuprofen for knee pain.  Meanwhile, other inmates bathed, clothed, and attended to Phillips.  Approximately two weeks after her initial collapse, Phillips was found dead in her cell.  *Id*. at 536-37.  Phillips estate filed claims against, among others, the mayor, sheriff, and administrative director of ambulance services in their individual capacities for failing to supervise the correctional officers which oversaw Phillips.  The district court found "these three supervisors' collective failure to train their employees as to the proper protocols constituted sufficient evidence that they should held liable in their individual capacities."  The Sixth Circuit reversed, finding the Estate "improperly conflates a § 1983 claim of individual supervisory liability with one of municipal liability."  *Id*. at 534.  The *Phillips* court held:

> The Estate's general allegations that the correctional officers and paramedics were not properly trained are more appropriately submitted as evidence to support a failure-to-train theory against the municipality itself, and not the supervisors in their individual capacities. *See City of Canton v. Harris*, 489 U.S. 378, 385, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989) (recognizing that a systematic failure to train officers adequately as a custom or policy may lead to city liability).  While an individual supervisor may still be held liable in his or her individual capacity under a failure-to-train theory, the Estate must point to a specific action of each individual supervisor to defeat a qualified immunity claim. And because the Estate has not advanced any specific allegations against Yager, Haggard, or Wright, we dismiss the case against these three defendants.

In this case, Plaintiff's allegations against the Frankfort-Based Defendants mirror the claims made in *Phillips*.  Plaintiff claims the Frankfort-Based Defendants promulgated policies, customs, and practices which led to their subordinates' unconstitutional acts.  Plaintiff has not alleged that the Frankfort-Based Defendants "either encouraged the specific incident of misconduct or in some other way directly participated in it."  *Hays*, 668 F.2d at 874.  Accordingly, Plaintiff may not maintain a § 1983 claim against the Frankfort-Based Defendants in their individual capacity for a failure to supervise.

## CONCLUSION

IT IS HEREBY ORDERED that, for the foregoing reasons, the Frankfort-Based Defendants' motions to dismiss (DN 106, 109) are GRANTED. Plaintiff's claims against James Erwin, LaDonna Thompson, Deborah Coleman, and Cookie Crews are hereby DISMISSED.