UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CIVIL ACTION NO. 5:15-CV-00007-TBR

ROBBIE EMERY BURKE, ADMINISTRATOR                    Plaintiff
OF THE ESTATE OF JAMES KENNETH EMBRY

v.

LADONNA THOMPSON, *et al.*                          Defendants

## MEMORANDUM OPINION AND ORDER

This matter comes before the Court on motions to dismiss filed by Defendant Gingy

Grider.  (DN 110).  Plaintiff filed a response.  (DN 114).  Defendant has replied.  (DN 119).  For

the following reasons, Defendant's motion to dismiss is DENIED.

## BACKGROUND

This action arises out of the death of James Kenneth Embry while he was an inmate at the

Kentucky State Penitentiary ("KSP").  Embry died of starvation and dehydration after refusing

thirty-five of his final thirty-six meals.  Following his death, the Kentucky Department of

Corrections conducted a Critical Incident Review which concluded that Embry's death "occurred

as a result of a systemic failure at the Kentucky State Penitentiary."  (DN 105-1, p. 19).  At this

stage the Court "must accept all of the allegations in the complaint as true, and construe the

complaint liberally in favor of the plaintiff."  *Lawrence v. Chancery Court of Tenn.*, 188 F.3d

687, 691 (6th Cir. 1999) (citing *Miller v. Currie*, 50 F.3d 373, 377 (6th Cir. 1995)).  The Court

will also consider the Critical Incident Review attached to Plaintiff's complaint.  *Rondigo, L.L.C.*

*v. Twp. of Richmond*, 641 F.3d 673, 680-81 (6th Cir. 2011) ("a court may consider exhibits

attached to the complaint, public records, items appearing in the record of the case and exhibits

1

attached to defendant's motion to dismiss so long as they are referred to in the complaint and are central to the claims contained therein, without converting the motion to one for summary judgment") (citation and punctuation omitted).

Embry was a 57-year-old inmate serving a nine-year sentence after being convicted of drug possession, assault, and wanton endangerment. Embry had a history of mental illness and had been prescribed various medications while at KSP. Embry was also disruptive, having "no less than 25 major disciplinary violations." (DN 105-1, p. 3). This disruptive pattern ceased on June 22, 2012. On that date Embry was assaulted by another inmate. The assault, which required Embry be transported to a local hospital for medical care, appeared to have a major impact on Embry. Embry received no further disciplinary reports until shortly before his death, when he was cited multiple times for failing to eat and harming himself. Embry was fearful and believed there was a "contract" on his life. (DN 105-1, p. 4).

Embry was prescribed various medications for his mental health while he was on inmate. On May 7, 2013, Embry informed the medical staff that he did not like how these medications made him feel and would no longer take certain medications. Gingy Grider, an advanced registered nurse practitioner ("APRN"), eventually discontinued all of Embry's medication on July 22, 2013, after refused to take any medication for two weeks.

Embry continued to fear for his own safety and on November 29, 2013, he was moved to a segregation unit, Cellhouse Three. On December 3, Embry told Dr. Jeane Hinkebein, a psychologist at KSP, that he wanted to return to his medication. Embry was "anxious and paranoid" and believed he "could not take it on the yard." (DN 105-1, p. 4). Embry also repeatedly made statements about wanting to harm himself. Dr. Hinkebein and Psychological

Associate Losser discounted these claims and concluded Embry's actions were goal-driven to influence where Embry would be housed. Embry saw Losser again on December 5. Embry repeated his concerns about his paranoia and again requested to return to his medication. Losser informed Embry that "medication is typically not initiated in segregation" and denied his request. (DN 105-1, p. 6). Embry was put on a 15-minute watch and put into a suicide smock due to statements he made to staff.

On December 7, Embry refused his breakfast and lunch trays, taking only his dinner tray. This began a pattern of Embry refusing at least a portion of his daily meals. On December 9, Embry was seen by Losser. Embry claimed he did not have "anything to live for." (DN 105-1, p. 7). However, Losser reported that Embry had no thoughts of self-harm. The following day, Embry began banging his head on his cell door. Embry was placed in a restraint chair and then moved to Seven Cellhouse for observation. Embry continued to claim he had nothing to live for and refused a portion of his daily meals. Dr. Hinkebein discounted Embry's statements because they were vague and he presented no defined plan for harming himself. (DN 105-1, p. 7).

On December 11, 2013, Embry was observed scratching his right forearm with a spork. Embry was ordered to stop and back towards the door to be handcuffed. Embry refused. The responding officer again ordered Embry to back towards the door to be handcuffed. Embry again refused. The Unit Supervisors pepper-sprayed Embry. Embry was placed on constant watch and seen by Dr. Hinkebein. Dr. Steve Hiland, the facility physician at KSP, and Bob Wilkinson, an advanced registered nurse practicioner ("ARNP"), were notified of the incident.

For the next nine days, Embry continued to periodically refuse meals and claim he wanted to hurt himself. On December 20, 2013, Embry began banging his head on his cell door

3

once again.  He was restrained, placed on constant watch, and visited by Dr. Hinkebein.  Embry stated:  "I felt like hurting myself, so I banged my head."  (DN 105-1, p. 7).

For the next week Embry continued to miss periodic meals.  On December 27, 2013, Embry received a disciplinary report for missing four consecutive meals.  Three days later he told Losser that he did not have a reason to live.  On January 2, 2014, Embry missed all three meals.  Dr. Hinkebein observed that Embry "wants to stay in the observation cell and appears comfortable there."  Dr. Hinkebein recommended that Embry be moved to Three Cellhouse.  (DN 105-1, p. 8).

On January 3, 2014, Embry was moved to Three Cellhouse.  He refused all three meals and was placed on hunger strike watch.  Gloria Lewis, a licensed practical nurse ("LPN"), noted that Embry has missed four consecutive meals.  Dr. Hinkebein noted that, despite Embry's claim that he will harm himself, he has still not formulated a plan for doing so.  Embry received another disciplinary report for missing meals.

On January 4, Embry refused all three meals.  The Unit Supervisors notified Jim Royster, a registered nurse ("RN"), who performed a vitals check.  Royster observed that Embry was "weak and shaky" and advised Embry to resume eating.  Embry responded that it "has been too long to resume now."  (DN 105-1, p. 8).  Embry's weight was recorded at 132 pounds; 32 pounds less than he weighed in September, 2013.

On January 5, Embry refused all three meals.  Embry did accept and drink tea during the evening.  Hope Gresham, an LPN, "instruct[ed] that due to him drinking, the hunger strike is ended."  (DN 105-1, p. 9).  Another LPN, Lori Secoy, noted that Embry has missed eleven consecutive meals.  Embry refused all three meal trays on January 6.

4

On January 7, Embry refused his breakfast and lunch trays but drank juice at lunch and accepted a cookie and two cups of tea in the evening.  Losser visited Embry, who stated he had just not been hungry.  The following day Embry again refused all three meal trays, but did accept two cups of tea.  Losser observed that Embry was "doing okay" and removed him from watch status.  (DN 105-1, p. 9).  On January 9, Embry accepted his breakfast tray and refused his lunch and dinner tray.  The following day he refused all three trays, taking only juice in the morning.  On January 11, he again refused all three trays.  Embry received his third disciplinary report for not eating.  On January 12, Embry refused all three trays.  Lewis, an LPN, noted her concern about Embry's disinterest in eating or drinking.

Embry passed away on the evening of January 13, 2014.  Embry refused all three meals offered that day.  On the morning of January 13 the Security Count Office contacted Josh Patton, a Correctional Unit Administrator ("CUA"), and informed him that Embry would be moved to the infirmary.  Bruce Bauer, an RN, had authorized the move due to Embry's refusal to eat.  Patton informed Bauer that Embry has accepted a drink and asked if Embry should still be moved.  The two consulted Wilkinson, an APRN.  Wilkinson instructed them that Embry should not be moved to the infirmary and should be taken off of the hunger strike.  (DN 105-1, p. 10).  Wilkinson later claimed he tried to move Embry to the infirmary on January 13, "but 'they' wouldn't bring him."  (DN 105-1, p. 16).  "He then went on to add that he often can't get inmates out to be seen because Security won't bring them.  (DN 105-1, p. 16).  The Critical Incident Review notes that Wilkinson's claim "was clearly contradictory to the statements of virtually every other staff member interviewed."  (DN 105-1, p. 16).

At approximately 5:04 that evening, Officer Brian Thomas was making rounds when he stopped outside Embry's cell.  Thomas noted that Embry was sitting on his toilet and was

5

unresponsive. Thomas called for his supervisor and medical staff. His supervisor, Randy Robinson, ordered the cell door opened. Robinson, Thomas, and Officer Bolton checked Embry and could not locate a pulse. Embry's "eyes were open and fixed." (DN 105-1, p. 2). LPN Gresham arrived and began to attempt resuscitation. EMT members arrived and also attempted to revive Embry, unsuccessfully. An autopsy concluded that Embry died from "dehydration with contributing starvation, duodenal ulcer, and emphysema with right ventricle hypertrophy." (DN 105-1, p. 6). Embry weighed 120 pounds, having lost 44 pounds in five months.

Following Embry's death, the Kentucky Department of Corrections ("KDOC") conducted a Critical Incident Review. This comprehensive review included interviewing twenty employees including the warden, medical staff, mental health staff, and correctional officers. The KDOC also reviewed activity sheets, meeting minutes, video footage, policies and protocols, and toured the cellhouses. The KDOC concluded that "the death of Inmate James Embry occurred as a result of a systemic failure at the Kentucky State Penitentiary involving many interacting issues." Among the problems noted by the KDOC were:

- "inadequate staffing," as only seven nurses were on staff whereas a normal rotation would require twelve nurses (DN 105-1, p. 13);

- a daily schedule that began at 2:00 a.m., giving inmates little time for uninterrupted sleep (DN 105-1, p. 12);

- sick call being conducted beginning at 5:00 a.m., with inmates only being seen if they are "standing at their cell door" with a "completed and signed money slip for the associated copay" when the Physician passes (DN 105-1, p. 12);

- the Physician "made no effort to look into any of the cells" and the accompanying nurses "appeared to be completely disengaged from the process" (DN 105-1, p. 13);

- Correctional officers performing rounds so quickly that they "spend little time actually on the segregation walks dealing with and see inmates face to face," resulting in "[n]one of the Program staff" having any "significant contact with Inmate Embry during his last 46 days in segregation" (DN 105-1, p. 11);

- weekly management meetings[1] meant to discuss inmates' mental health instead focused on behavioral issues, resulting in "[n]one of the staff" being able to recall Embry being discussed and the report "[n]othing new noted" listed next to Embry's name at a time when he had missed twenty-three of his last twenty-four meals (DN 105-1, p. 14).

- the assault on Embry which triggered his request to be placed in a segregation unit was not investigated, even though policy required an investigation (DN 105-1, p. 10);

- an "unwritten policy" that inmates who enter segregation were not evaluated for or prescribed psychotropic medications (DN 105-1, p. 15);

- the lack of a clear definition of what constitutes a hunger strike in either the Health Service Protocol ("HSP") or Medical Standing Orders ("MSO") (DN 105-1, p. 14);

---

[1] These meetings were allegedly attended by Defendants Duke Pettit, John Wood, Josh Patton, Hobert Huddleston, Bruce Von Dwingelo, Adam Noles, Gingy Grider, and other medical staff. (DN 105).

- while the HSP and MSO "are very clear as to how a hunger strike is to be managed once declared. . . . most staff stated they were unfamiliar with the MSO's or the HSP although they indicated they knew they existed" (DN 105-1, p. 15);

- "all of the Nurses interviewed stated that they have been directed not to follow the MSO's and to call the facility Physician" instead, which was a "directive enforced by both the APRN and the facility Physician himself." (DN 105-1, p. 17).

Plaintiff alleges that the KDOC's investigation was not the first warning sign that there was a "culture of indifference" at the Kentucky State Penitentiary. (DN 105). Plaintiff alleges that in 2011, a KSP inmate named Clifford Warfield died after being classified as on hunger strike. Warfield had a documented history of bowel obstructions and did not eat or drink for five days. While KSP staff believed Warfield was malingering, his intestines were turning gangrenous, ultimately leading to his death. Plaintiff believes that other similar incidents have occurred. (DN 105).

PROCEDURAL HISTORY

This action was initially filed as two separate lawsuits. Mark Pfeifer was appointed the administrator of Embry's estate in Daviess County and filed a case on January 12, 2015. *Pfeiffer v. Thompson*, 5:15-CV-00007. Robbie Emery Burke was appointed the administrator of Embry's estate in Lyon County and filed a case on January 15, 2015. *Burke v. Correct Care Solutions, LLC*, 5:15-CV-00015. The Daviess County case has been amended to name Ms. Burke the administrator. The Court has consolidated these cases. (DN 86).

At this time the Court considers the motion to dismiss filed by Defendant Gingy Grider.

8

STANDARD

"When considering a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the district court must accept all of the allegations in the complaint as true, and construe the complaint liberally in favor of the plaintiff." *Lawrence v. Chancery Court of Tenn.*, 188 F.3d 687, 691 (6th Cir. 1999) (citing *Miller v. Currie*, 50 F.3d 373, 377 (6th Cir. 1995)). Denial of the motion is proper "unless it can be established beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Achterhof v. Selvaggio*, 886 F.2d 826, 831 (6th Cir.1989) (citing *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)). Nonetheless, unwarranted factual inferences or legal conclusions masquerading as fact will not prevent a motion to dismiss. *Blakely v. United States*, 276 F.3d 853, 863 (6th Cir. 2002). A "complaint must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under some viable legal theory." *Andrews v. Ohio*, 104 F.3d 803, 806 (6th Cir. 1997) (citing *In re DeLorean Motor Co.*, 991 F.2d 1236, 1240 (6th Cir. 1993)).

DISCUSSION

Plaintiff has asserted five claims: (1) violation of constitutional rights pursuant to 42 U.S.C. § 1983; (2) negligence and gross negligence; (3) intentional infliction of emotional distress; (4) wrongful death; (5) negligence per se. Grider raises several arguments as to why Plaintiff's claims against Grider should be dismissed. Grider argues Plaintiff has failed to plead sufficient facts to support (I) a § 1983 claim against Grider or (II) claims for negligence or wrongful death. Grider also argues (III) two superseding causes negate Grider's alleged liability. Grider request dismissal of Plaintiff's (IV) intentional infliction of emotional distress claim on the grounds that it is a gap-filler claim. Finally, Grider argues (V) Plaintiff's claims should be barred by KRS § 454.415 for failure to exhaust administrative remedies.

## I.     Plaintiff's § 1983 Claim Against Grider.

Plaintiff claims that all defendants, including Grider, violated Embry's right under the Eighth Amendment to be free from cruel and unusual punishment.  Grider argues that Plaintiff has failed to allege sufficient facts to state a claim under § 1983.

"An Eighth Amendment claim has two components, one objective and one subjective." *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001).  "To satisfy the objective component, the plaintiff must allege that the medical need at issue is 'sufficiently serious.'"  *Id*. at 703 (quoting *Farmer*, 511 U.S. at 834).  "A serious medical need is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'"  *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008) (*quoting Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 897 (6th Cir. 2004).  A "prison official's act or omission must result in the denial of 'the minimal civilized measure of life's necessities'" *Farmer*, 511 U.S. at 832 (citation omitted) ("prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care").

In this case, even a lay person would easily recognize that Embry's condition required medical attention.  At the time of his death Embry has missed thirty-five of his prior thirty-six meals.  He had lost 44 pounds in five months.  He repeatedly stated he would harm himself.  On several occurrences he banged his head against his cell door.  Embry was in obvious need of medical help for his mental and physical health.  *See e.g. Shadrick v. Hopkins Cty., Ky.*, 805 F.3d 724, 737 (6th Cir. 2015) (finding inmate's MRSA infection, which caused repeated vomiting, diarrhea, open sores, and eventual death, "easily met" the objective component as it was obvious); *Comstock*, 273 F.3d at 703-04 ("Because plaintiff alleges that defendants were indifferent to Montgomery's psychological needs, namely his suicidal tendency, she easily

satisfies the objective component of her constitutional claim").  Accordingly, the Court finds that

Plaintiff has sufficiently pled the objective component of an Eighth Amendment claim.

"To satisfy the subjective component, the plaintiff must allege facts which, if true, would

show that the official being sued subjectively perceived facts from which to infer substantial risk

to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk."

*Comstock*, 273 F.3d at 703.  "The requirement that the official have subjectively perceived a risk

of harm and then disregarded it is meant to prevent the constitutionalization of medical

malpractice claims."  *Id*.

The subjective component requires "a state of mind more blameworthy than negligence."

*Farmer*, 511 U.S. at 835; *Estelle*, 429 U.S. at 105-06 ("an inadvertent failure to provide adequate

medical care cannot be said to constitute 'an unnecessary and wanton infliction of pain' or to be

'repugnant to the conscience of mankind'").  It does not, however, require a purposeful intent to

cause pain.  Instead, "subjective recklessness as used in the criminal law is a familiar and

workable standard that is consistent with the Cruel and Unusual Punishments Clause."  *Farmer*,

511 U.S. at 839-40.  "This state of mind requires that the official consciously disregard a

substantial risk of serious harm."  (citation and punctuation omitted) *Brooks v. Celeste*, 39 F.3d

125, 128 (6th Cir. 1994).  "Whether a prison official had the requisite knowledge of a substantial

risk is a question of fact subject to demonstration in the usual ways, including inference from

circumstantial evidence, and a factfinder may conclude that a prison official knew of a

substantial risk from the very fact that the risk was obvious."  *Farmer*, 511 U.S. at 842 (citation

omitted).  "This subjective component 'should be determined in light of the prison authorities'

current attitudes and conduct.'"  *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 895 (6th Cir.

2004) (quoting *Helling v. McKinney*, 509 U.S. 25, 36, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993)).

"Each defendant's liability must be assessed individually, based on his or her own actions." *Dorsey v. Barber*, 517 F.3d 389, 399 n. 4 (6th Cir. 2008). Accordingly, the Court must consider whether Grider perceived there was a risk to Embry and disregarded that risk. The Court finds that Plaintiff has alleged sufficient facts from which a jury could conclude that Grider was aware of the risk to Embry and failed to address that risk. Grider, an APRN, appeared to have authority over the psychotropic medications provided to inmates. Grider discontinued one of Embry's medications on May 7, 2013, at Embry's request. Grider subsequently discontinued the rest of Embry's medications on July 22, 2013, after it was noted that Embry had refused to take his medication for the past two weeks. Embry subsequently requested he be returned to his medication, though this request was made to Dr. Hinkebein and it is unclear if Grider was informed of this request. Grider was a member of a weekly management team meeting which was meant "to review and discuss inmates in segregation who present with specific problems relative to mental health, medical, and behavioral management." (DN 105-1, p. 13). This group met four times while Embry was in segregation. The Critical Incident Review criticizes these meetings for focusing on "behavioral management issues rather than that of mental health and medical management." (DN 105-1, p. 13). At the first two of these meetings, Embry was apparently not discussed, even though by the second he had been on hunger strike, banged his head against his cell door, been pepper-sprayed and restrained, and claimed he had nothing to live for. Embry was apparently discussed at the second two meetings, the last of which occurred only four days before his death. Grider argues that the meeting notes stated "[n]othing new noted" next to Embry, thereby proving that Grider was unaware of Embry's status. At this stage, the Court cannot accept such a factual inference in favor of Grider. The Court finds that Plaintiff has alleged sufficient facts in claiming that Grider had authority

over Embry's medication and that Grider was a member of a weekly management team responsible for supervising the mental health of inmates like Embry, thereby showing that Grider was aware of Embry's mental health needs.

Grider relies on the case of *Comstock v. McCrary* for support of his argument that he did not have subjective knowledge of the risk to Embry.  273 F.3d 693 (6th Cir. 2001).  In that case, Billy Wade Montgomery was an inmate who was placed on suicide watch.  Montgomery was suffering severe anxiety after other prisoners labeled him a snitch.  On March 2, 1995, Montgomery met with Norris McCrary, a psychologist, for an evaluation.  McCrary placed Montgomery on suicide watch, which included being dress in a "bam-bam," restricted to finger foods, and being checked every ten minutes.  The following day David Howell, a physician's assistant, met with Montgomery to perform a previously scheduled physical examination.  Howell observed that Montgomery was dressed in suicide prevention garb and noted that Montgomery did not appear to have psychotic symptoms at that time.  After Howell's visit, McCrary performed a follow-up visit.  McCrary believed that Montgomery had calmed down and recommended that Montgomery be placed back in his cell, which Montgomery was.  That afternoon, Montgomery hanged himself with a bedsheet.  *Id.* at 699.  The Sixth Circuit found that McCrary subjectively perceived and disregarded the risk of serious harm to Montgomery.  *Id.* at 704-11.  Conversely, the court held Howell did not perceive the risk of harm because when Howell observed Montgomery, he was "dressed in a suicide prevention garment" and had been "had been stripped of his personal clothing, limited to finger foods, and was checked on every ten minutes."  *Id.* at 712.  ("It is simply impossible for us to conclude that Howell perceived a substantial risk that Montgomery would commit suicide when he observed Montgomery in these circumstances").  The *Comstock* case is distinguishable because although Howell observed an

13

inmate in need of mental health care, Howell also observed that this need was being met.  As the *Comstock* court noted, "Howell had no way of knowing that McCrary would remove Montgomery from suicide watch shortly after [Howell's] physical examination and thus that Montgomery would have the opportunity to carry through on any perceived suicidal intentions. *Id*.

Grider also relies on the *Webb v. Jessamine Cty. Fiscal Court* for support.  802 F. Supp. 2d 870 (E.D. Ky. 2011).  In *Webb*, Ashley Webb was booked at the Jessamine County Detention Center while nine months pregnant.  Shortly thereafter she informed Deputy Jailer Tami Jean Teaven that "she was suffering sharp back pains, that she was experiencing vaginal discharge, that the mucous plug had discharged from her cervix, and that she felt the urge to have a bowel movement but was unable to do so."  *Id.* at 875.  For the next eight hours Webb repeatedly informed Teaven that her labor was progressing and requested medical help.  Teaven declined to call for help and told Webb "to put her wet pants back on and stop urinating on herself."  *Id.* at 876.  Webb eventually passed out, "only to come to with EMS assisting her in delivering her baby."  *Id*. at 876.  The district court held there was sufficient factual allegations that Teaven subjectively perceived and disregarded a serious medical risk to Webb.  Grider focuses on the *Webb* court's holding with regard to another jailer.  On that night James David Crowe was on duty and could view Webb's cell from his station.  Crowe received reports from Teaven about Webb's status.  At one point Crowe approached Webb's cell and told her through the door to "stop lying . . . and stop acting like a child."  *Id*. at 882.  The Eastern District of Kentucky held that Crowe was entitled to qualified immunity because although "Crowe knew that Webb was pregnant," had "heard a commotion from where Webb was housed and received Teaven's reports of what was going on," the Court could not "say with any certainty that he was aware that her

14

amniotic sac had ruptured because the Court does not know what he was told by his colleagues." *Id*. at 882.

This Court finds the Sixth Circuit case of *Blackmore v. Kalamazoo Cty* to be more persuasive. 390 F.3d 890, 893 (6th Cir. 2004). In that case, Tjymas Blackmore was arrested for driving on a suspended license early on May 27, 2000. "Within an hour of his arrival, Blackmore began experiencing abdominal pain and complained to a deputy jailor, requesting medical care." *Id*. at 894. For the next two days Blackmore repeatedly requested medical care. Other than giving Blackmore antacids, jail officials took no action. Approximately forty-eight hours after his first complaint a jail nurse examined Blackmore and diagnosed him with appendicitis. Blackmore was transported to a hospital and a successful appendectomy was performed. *Id*. Blackmore claimed the jailors violated his constitutional rights by denying him prompt medical care. The jailors moved for summary judgment, arguing in part that they lacked a sufficiently culpable state of mind. Both the district court and the Sixth Circuit disagreed with the jailors,[2] finding the prescription of antacids, the knowledge that Blackmore vomited, and the fact that he complained of abdominal pain were sufficient for a reasonable jury to conclude that the jailors were aware of Blackmore's need for medical help. *Id*. at 896; *see also Woods v. Lecureux*, 110 F.3d 1215, 1224 (6th Cir. 1997); *St. v. Corr. Corp. of Am.*, 102 F.3d 810, 815 (6th Cir. 1996); *Greene v. Bowles*, 361 F.3d 290, 294 (6th Cir. 2004).

In short, the allegations in the complaint are sufficient to deny Grider's motion to dismiss. Further discovery will shed light on the actual facts of this case, including what knowledge Grider may have had as to Embry's condition.

---

[2] The case was on appeal because the district court held that Blackmore did not have a sufficiently serious medical need, a holding the Sixth Circuit reversed. 390 F.3d at 899.

## II.        Negligence and Wrongful Death.

Grider also moves to dismiss all of Plaintiff's negligence claims and wrongful death claim on the grounds that Grider did not owe a duty of care to Embry.  "In order to state a cause of action based on negligence, a plaintiff must establish a duty on the defendant, a breach of the duty, and a causal connection between the breach of the duty and an injury suffered by the plaintiff."  *Lewis v. B & R Corp.*, 56 S.W.3d 432, 436-37 (Ky. Ct. App. 2001).  "Duty, the first element, presents a question of law."  *Pathways, Inc. v. Hammons*, 113 S.W.3d 85, 89 (Ky. 2003).  "If no duty is owed by the defendant to the plaintiff, there can be no breach thereof, and therefore no actionable negligence."  *Ashcraft v. Peoples Liberty Bank & Trust Co.*, 724 S.W.2d 228, 229 (Ky. Ct. App. 1986).  "The physician's duty to a patient arises when, by his words *or deeds*, 'he agrees to treat a patient, thus establishing a physician/patient relationship.'" (emphasis in original) *Jenkins v. Best*, 250 S.W.3d 680, 688 (Ky. Ct. App. 2007) (quoting *Noble v. Sartori*, 799 S.W.2d 8, 9 (Ky.1990)).  "Kentucky law imposes a specific duty on jailers to 'exercise reasonable and ordinary care and diligence to prevent unlawful injury to a prisoner placed in his custody.'"  *Smith v. Franklin Cty.*, 227 F. Supp. 2d 667, 680 (E.D. Ky. 2002) (citation omitted).

In this case, Grider appeared to have authority over the psychotropic medications provided to Embry.  Grider discontinued one of Embry's medications at his request and subsequently discontinued the remainder of Embry's medications several months later after Emrby stopped taking medication for two weeks.  Accordingly, under the facts alleged, Grider had established a relationship with Embry as a medical professional and owed a duty of care to Embry.

Grider argues that he did not owe a duty of care to Embry because Embry did not plead any facts showing that Grider provided medical care to Embry after Embry was transferred to a

segregation unit and began refusing meals.  In response, Plaintiff provides two reasons why Grider's argument must fail.  First, Plaintiff's claims against Grider are partly based off the fact that "Grider discontinued Mr. Embry's mental health medications," which occurred before Embry was transferred to a segregation unit.  (DN 114).  Second, "Grider participated in weekly management team meetings in which the health, medical and behavioral management issues of inmates in segregation, like Mr. Embry, were supposed to be discussed."  (DN 114).  These meetings occurred while Embry was starving himself.  The Court finds that Plaintiff has alleged sufficient facts which establish that Grider owed a duty to Embry.

Grider relies on *Jenkins v. Best*, 250 S.W.3d 680 (Ky. Ct. App. 2007) in support of her argument.  The *Jenkins* case involved a claim against a doctor, Gail Best, who was on call as a perinatologist at Baptist Hospital.  One evening Best was called to perform an ultrasound on Marilyn Jenkins.  Dr. Best informed the nurse that she was unable to do so until the following morning.  Another doctor examined Jenkins and the ultrasound was scheduled for the following morning.  That night, Jenkins experienced complications which led to her son being born with hypoxic ischemic encephalopathy.  Jenkins filed a medical malpractice claim against, among others, Dr. Best.  The Kentucky Court of Appeals held that because Dr. Best was at another location, "never saw or examined Jenkins, never spoke to her or consulted her or gave her advice," reviewed her chart, issued medical orders, or otherwise participate in Jenkins' diagnosis or treatment, Dr. Best did not owe a duty of care to Jenkins.  *Id.* at 688.  The Court finds *Jenkins* factually distinguishable because Plaintiff has alleged that Grider participated in Embry's treatment.  Furthermore, *Jenkins* addressed plaintiff's claims against Dr. Best upon a motion for summary judgment.  As this is before the Court at the motion to dismiss stage, the Court finds that Plaintiff has pled sufficient facts to defeat Grider's motion to dismiss.

17

### III.    Superseding Causes.

Grider also argues Plaintiff's negligence claims must be dismissed against Grider because of two superseding cause.  "A superseding cause is an act of a third person or other force which by its intervention prevents the actor from being liable for harm to another which his antecedent negligence is a substantial factor in bringing about."  *Com., Transp. Cabinet, Dep't of Highways v. Babbitt*, 172 S.W.3d 786, 793 (Ky. 2005) (quoting Donegan v. Denney, 457 S.W.2d 953, 958 (Ky.1970)).  A superseding cause possesses the following attributes:

> 1) an act or event that intervenes between the original act and the injury;  2) the intervening act or event must be of independent origin, unassociated with the original act;  3) the intervening act or event must, itself, be capable of bringing about the injury;  4) the intervening act or event must not have been reasonably foreseeable by the original actor;  5) the intervening act or event involves the unforeseen negligence of a third party [one other than the first party original actor or the second party plaintiff] or the intervention of a natural force; 6) the original act must, in itself, be a substantial factor in causing the injury, not a remote cause.  The original act must not merely create negligent condition or occasion; the distinction between a legal cause and a mere condition being foreseeability of injury. *NKC Hosps., Inc. v. Anthony*, 849 S.W.2d 564, 568 (Ky. Ct. App. 1993)

A superseding cause is an event of an "'extraordinary rather than normal,' or 'highly extraordinary,' nature, unforeseeable in character, as to relieve the original wrongdoer of liability to the ultimate victim."  *Montgomery Elevator Co. v. McCullough by McCullough*, 676 S.W.2d 776, 780 (Ky. 1984) (quoting *Kellerman*, 519 S.W.2d at 382);  *NKC Hosps.*, 849 S.W.2d at 568 ("if the resultant injury is reasonably foreseeable from the view of the original actor, then the other factors causing to bring about the injury are not a superseding cause").

The Court determines whether an act is a superseding cause.  However, the Court only reaches this legal issue once the underlying facts are "undisputed."  *Kellerman*, 519 S.W.2d at 383; *Wilson v. Sentry Ins.*, 993 F. Supp. 2d 662, 666 (E.D. Ky. 2014) ("The factual circumstances giving rise to Plaintiff's injuries are undisputed; thus, whether there is a

superseding cause is a legal issue for the Court"). If the facts surrounding the occurrence of an intervening act are in dispute, the establishment of those facts becomes an issue for the jury. *James v. Meow Media, Inc.*, 90 F. Supp. 2d 798, 806 (W.D. Ky. 2000), *aff'd*, 300 F.3d 683 (6th Cir. 2002); *Fryman v. Harrison*, 896 S.W.2d 908, 911 (Ky. 1995) *holding modified by Gaither v. Justice & Pub. Safety Cabinet*, 447 S.W.3d 628 (Ky. 2014) ("There was no dispute that the claimed act of negligence or the assault actually occurred. Thus the issue was not a mixed question of law and fact").

Grider argues Embry's "mental state changed significantly between July 22, 2013, when Plaintiff alleges that Ms. Grider last treated Mr. Embry, and November 29, 2013, when Plaintiff alleges that Mr. Embry first presented to KSP's medical staff with complaints of increased paranoia and self-harmful thoughts." Grider also argues that "KSP's treatment of Mr. Embry" was a superseding cause. (DN 110). Both of these alleged superseding events require factual determinations which are inappropriate at this stage.

### IV.    Intentional Infliction of Emotional Distress.

"One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm." *Childers v. Geile*, 367 S.W.3d 576, 579 (Ky. 2012). A claim for intentional infliction of emotional distress, also known as outrage, has four elements: 1. The wrongdoer's conduct must be intentional or reckless; 2. The conduct must be outrageous and intolerable in that it offends against the generally accepted standards of decency and morality; 3. There must be a causal connection between the wrongdoer's conduct and the emotional distress; and 4. The emotional distress must be severe." *Kroger Co. v. Willgruber*, 920 S.W.2d 61, 65 (Ky. 1996).

Grider argues Plaintiff's outrage claim must be dismissed because Plaintiff's outrage claim is duplicative of Plaintiff's negligence claims. The "tort of outrage is intended as a 'gap-filler', providing redress for extreme emotional distress where traditional common law actions do not." *Banks v. Fritsch*, 39 S.W.3d 474, 481 (Ky. Ct. App. 2001). However, this does not mean that a claim for outrage must be dismissed if the plaintiff has also asserted traditional torts for which damages for emotional distress could be recovered. "[T]here is a clearly developed paradigm for outrage: when actions or contact is intended only to cause extreme emotional distress in the victim." *Brewer v. Hillard*, 15 S.W.3d 1, 8 (Ky. Ct. App. 1999). Therefore, a separate claim for outrage may be maintained if it was the defendant's intent to cause extreme emotional distress, even though that act might constitute another tort. *Abney v. Gulley Remodeling And Maint., Inc.*, No. 2009-CA-001490-MR, 2010 WL 2867933, at *4 (Ky. Ct. App. July 23, 2010) ("Although it could be argued that the grabbing of Abney's breasts and the slapping of her buttocks constituted the tort of battery, the acts may also be construed to constitute the tort of outrage where the intent was only to cause Abney extreme emotional distress"). In other words, the tort of outrage may be "pleaded alternatively, but there can be only one recovery on a given set of facts." *Childers*, 367 S.W.3d 582.

Plaintiff has alleged that the defendants intentionally caused severe emotional distress. While the facts of this case may also support Plaintiff's claims for negligence, it may be that certain defendants acted only with an intent to cause emotional harm. "[A]t this early stage, the plaintiff's assertions must be assumed true." *Green v. Floyd Cty., Ky.*, 803 F. Supp. 2d 652, 655 (E.D. Ky. 2011). Accordingly, the Court will permit Plaintiff's outrage claim to proceed at this stage of the proceedings. *See e.g. Green*, 803 F. Supp. 2d at 655 (holding outrage claim survived a motion to dismiss because the assertion that "defendants stood by while inmates led Mr. Fisher

20

around by a leash and forced him to act like a dog—a presumably painless, but undoubtedly

humiliating, experience" could support both an outrage claim and a § 1983 claim).

### V.     Failure to Exhaust Administrative Remedies.

Finally, Grider moves to dismiss Plaintiff's state law claims for failure to exhaust

administrative remedies.  In support, Grider cites to KRS § 454.415, which provides:

> No action shall be brought by or on behalf of an inmate, with respect to:
>
> (a)  An inmate disciplinary proceeding;
> (b) Challenges to a sentence calculation;
> (c) Challenges to custody credit; or
> (d) A conditions-of-confinement issue
>
> until administrative remedies as set forth in the policies and procedures of the
> Department of Corrections, county jail, or other local or regional correctional
> facility are exhausted.

Grider argues that the medical care and treatment that Embry received while an inmate was a

"condition of Mr. Embry's confinement."  (DN 110).  Grider claims that the failure of Embry, or

Plaintiff, to exhaust administrative remedies bars Plaintiff's state law claims.

In response, Plaintiff argues that the exhaustion of remedies doctrine does not apply to

former prisoners.  In support, Plaintiff cites a host of cases which hold that the "exhaustion

requirement does not apply to suits brought by former inmates."  *Mabry v. Freeman*, 489 F.

Supp. 2d 782, 785 (E.D. Mich. 2007).  Grider contends that all of the cases cited by Plaintiff

involved federal claims decided pursuant to the Prison Litigation Reform Act ("PLRA").

Conversely, Plaintiff's negligence and wrongful death claims are state law claims to which KRS

§ 454.415, a state statute, should be applied.  Neither party has cited a Kentucky case interpreting

whether the exhaustion requirement found in KRS § 454.415 applies to former prisoners and this

Court has been unable to find any such case.  Therefore, the Court will interpret the language of

KRS § 454.415 to determine whether it applies to claims brought by or on behalf of inmates who are no longer incarcerated.  In doing so, the Court finds the statutory language of the PLRA to be analogous and case law interpreting the PLRA to be persuasive.

The PLRA states:  "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C.A. § 1997e(a).  The PLRA defines "prisoner" as "any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program."  42 U.S.C.A. § 1997e(h).

KRS § 454.415 provides "[n]o action shall be brought by or on behalf of an inmate . . . until administrative remedies as set forth in the policies and procedures of the Department of Corrections, county jail, or other local or regional correctional facility are exhausted."  The term "inmate" is defined as "any person confined in either a state or federally operated facility, a county jail or other facility of local government, or in a private facility under contract with the Department of Corrections."  KRS § 454.400.

"While the Sixth Circuit has not specifically decided this issue, every federal court of appeals that has addressed this issue has held that the PLRA's exhaustion requirement does not apply to suits brought by former inmates."  *Mabry v. Freeman*, 489 F. Supp. 2d 782, 785 (E.D. Mich. 2007) (collecting cases).  These cases hold that the "language of the statute is plain and unambiguous—the exhaustion requirement applies only to 'prisoners.'"  *Talamantes v. Leyva*, 575 F.3d 1021, 1023 (9th Cir. 2009).  A person "not 'incarcerated or detained' in this manner at

the time the action is filed is not a 'prisoner' for purposes of the statute, and therefore, not subject to the exhaustion requirement." *Id*.

This Court finds this interpretation of the PLRA to be applicable to KRS § 454.415. An inmate is defined as "any person confined in either a state or federally operated facility." KRS § 454.400. Though it could have, it does not include any person who *was* confined. *Harris v. Garner*, 216 F.3d 970, 975 (11th Cir. 2000) ("It is confinement status at the time the lawsuit is 'brought, i.e., filed, that matters") (collecting cases). The Court also finds the reasoning for why former prisoners are not required to exhaust administrative remedies under the PLRA to be applicable to KRS § 454.415. "To require former prisoners to initiate or pursue those internal, administrative remedies once they have left the confines of a facility is a strained application of § 1997e at best." *Smith v. Franklin Cty.*, 227 F. Supp. 2d 667, 676 (E.D. Ky. 2002). "Former prisoners are no longer members of the community that such administrative processes and limitations are meant to serve." *Id*. This conclusion is even more compelling when the suit is brought by the personal representative and alleges that the death was caused by the conditions of confinement. See also *Mabry*, 489 F. Supp. 2d at 785 (finding that although "[f]iling lawsuits while in prison "has become a recreational activity for long-term residents of our prisons, because prisoners have little to lose and everything to gain, . . . former prisoners must expend valuable time and money to file suits and, consequently, do not need the same disincentive to filing frivolous lawsuits as current prisoners") (citations omitted). Accordingly, the Court holds that KRS § 454.415 does not apply to actions brought by or on behalf of former inmates.

CONCLUSION

IT IS HEREBY ORDERED that, for the foregoing reasons, the Grider's motion to dismiss (DN 110) is DENIED.

23