UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT PADUCAH
CIVIL ACTION NO. 5:15-CV-7-TBR

MARK PFIEFER, *Administrator of the Estate of James Kenneth Embry, Deceased,*                                     PLAINTIFF

v.

STEVE HILAND, M.D.,                                        DEFENDANTS

**MEMORANDUM OPINION & ORDER**

This matter comes before the Court upon Defendant Steve Hiland, M.D.'s Motion for Summary Judgment. (R. 207). Fully briefed, the matter is ripe for adjudication. For the reasons that follow, Hiland's Motion is GRANTED IN PART, and DENIED IN PART.

BACKGROUND

    **A. Inmate Embry's Death.**

James Embry was an inmate at Kentucky State Penitentiary (KSP). He suffered from bipolar and other mood disorders for which he received psychotropic medications while incarcerated. (R. 207-1, Ex. 12, Embry's Med. R., pp. 56-62). However, in May and June of 2013, those medications were discontinued by KSP mental health providers. (*See Id.*). In November of 2013, Embry was transferred to the Segregated Management Unit within KSP. While there, Embry made multiple request to mental health providers to be put back on his medications. (*Id.*). They refused. (*Id.*). From December to January, Embry made numerous complaints to mental health providers at KSP, telling them things such as, "I have nothing left to live for," "I don't feel good, I am up and down," and "I still want to hurt myself." (*Id.*). In fact, Embry did hurt himself—twice. On December 10, 2013, Embry struck his head on his cell door,

1

and was seen by a nurse. (*Id.*). The next day, Embry scratched his arm with a plastic spork. (*Id.*). Also from December to January, Embry started increasingly refusing meals. (*Id.*). By January, Embry was missing meals regularly. (*Id.*). Finally, on January 13, 2014, Embry was found dead in his cell from dehydration with contributing starvation, duodenal ulcer, and emphysema with right ventricle hypertrophy. (R. 207-1, Ex. 1, Med. Examiner's Rep., p.1).

**B. The KSP Nursing Staff.**

Throughout December and January the KSP nursing staff, along with various mental health professionals, came into contact with Embry and made decisions affecting his care. Specifically, KSP Nurse Jim Royster came into contact with Embry on January 4, 2014. On that occasion, Nurse Royster sent the following medical note to KSP Physician Steve Hiland and Nurse Practitioner Bob Wilkinson:

> [Embry] states that he is weak and shaky. [Embry] appears pale and extremities shake. Advised [Embry] that best plan of action would be to resume eating. [Embry] states that he thinks it has been too long to resume now. Weight is 138, last recorded weight 9/26/13 of 170. This is a loss of 32 lbs. Will recheck weight and notify provider. [Embry] is also tachycardic. Unable to check b/p d/t.

(R. 207, Ex. 14, Embry's Med. R., p. 22). Similarly, KSP Nurse Bruce Bruaer was specifically involved, at least in some manner, with a decision concerning Embry's transfer from his cell to the infirmary the day he died. The extent of Bauer's involvement is disputed. Embry was never transferred from his cell. (R. 207, Ex. 12, External Movement Report). He died there. (*Id.*).

There is evidence suggesting the KSP Nursing staff followed rules and policies created or promulgated by Dr. Hiland, the KSP Physician. (R. 224, Ex. 6, Bauer Depo. p. 14; R 224, Ex. 7, Secoy Depo. p. 120). There is also evidence that at least some of the KSP nursing staff thought there would be employment related consequences if they did not. (*Id.*). However, Dr. Hiland never issued any specific orders to any nurse at KSP regarding Embry's care.

2

**C. Doctor Hiland.**

Dr. Steve Hiland was a KSP Physician at the time of Embry's death. In fact, he was the only KSP Physician at that time. (R. 269, Hiland Depo., p. 134). Hiland claims he never treated Embry, and there is no evidence to the contrary. (*Id.* at p. 191). However, Hiland cosigned, with Nurse Practitioner Wilkinson, the January 4, 2014 medical note from Nurse Royster while on vacation.

Hiland started vacation on January 3, 2014. (R. 207., Ex. 22, Crall Email; R. 207., Ex. 24, Hiland travel receipts). He did not return from vacation until after Embry's death. *(Id.)*. There is no evidence Hiland knew Embry had skipped meals prior to the January 4, 2014. There is no evidence that Hiland was responsible for Embry's physical care while on vacation. To the contrary, there is evidence Hiland was not responsible for Embry's physical care on vacation. (R. 207, Ex. 8, Crall Depo., pp. 249-250). Instead, Nurse Practioner Bob Wilkinson was responsible for Embry's care while Dr. Hiland was on vacation. (*Id.*). There is nothing in the Record that suggest Hiland had reason to question Wilkenson's professional competency.

There is no evidence Hiland was ever responsible for, or aware of, Embry's mental health. Indeed, there is evidence that Embry's mental health was outside Hiland's purview at KSP. (*Id.*; R. 207, Ex. 16. Hinkebein Depo., p. 227).

**D. The "Tea-Rule."**

There is evidence that some of the KSP staff, including the KSP medical staff, followed the "tea-rule." (R. 224, Ex. 6, Bauer Depo., pp. 24, 140; R. 224, Ex. 13, Wilkinson Depo., pp. 82, 90-91). The tea-rule was an unwritten policy dictating that if an inmate had any caloric intake, including from juice, or even tea (hence the name), that inmate was no longer classified as being on hunger-strike. There is evidence the KSP nursing staff adhered to the unwritten rule, that it

3

was applied to Embry, and that Dr. Hiland created or promulgated it. (R. 269, Metzner Depo., pp. 161-162; R 224, Ex. 6, Bauer Depo., pp. 24, 140)

### E. KSP's Standing Hunger-Strike Order.

Once inmates have refused a number of meals they are determined to be on hunger-strike. (R. 207, Ex. 21, KSP hunger-strike Policy). KSP has a standing order to be followed by the medical staff for inmates determined to be on hunger-strike. (R. 224, Ex. 12, standing order). The KSP standing order includes monitoring the inmate. (*Id.*). There is evidence that Dr. Hiland established a rule that the KSP nursing staff was not to follow standing orders at KSP, including the hunger-strike standing order. (R. 224, Ex. 6, Bauer Depo., p. 62; R. 224, Ex. 7, Secoy Depo., pp. 120-121).

### F. The Issue Before the Court.

On behalf of Embry's estate, Mark Pfeifer has sued numerous individuals, including Dr. Hiland, involved with Embry's mental and physical care at KSP. All Defendants, except Hiland, have either been dismissed or settled. Pfeifer brings two federal claims and various state claims against him. Pfeifer brings the Federal claims pursuant to 42 U.S.C. § 1983 for deliberate indifference and supervisory liability. Hiland now moves for summary judgment on these federal claims.

STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec.*

*Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).

"[N]ot every issue of fact or conflicting inference presents a genuine issue of material fact." *Street v. J. C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989). The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case. *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996). The plaintiff must present more than a mere scintilla of evidence in support of his position; the plaintiff must present evidence on which the trier of fact could reasonably find for the plaintiff. *See id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). The plaintiff may accomplish this by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute . . . ." Fed. R. Civ. P. 56(c)(1). Mere speculation will not suffice to defeat a motion for summary judgment; "the mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment. A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Monette v. Electronic Data Sys. Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996).

DISCUSSION

Hiland moves for summary judgment on both Pfeifer's 42 U.S.C. § 1983 claims for deliberate indifference and supervisory liability. "Under 42 U.S.C. § 1983, a plaintiff must allege that he was deprived of a right secured by the Federal Constitution or laws of the United States by a person acting under color of state law." *Wolotsky v. Huhn*, 960 F.2d 1331, 1334 (6th Cir. 1992). There is no dispute that Hiland was acting under color of state law. Instead, Hiland challenges Pfeifer's claims based on the failure to establish the underlying constitutional

5

deprivations; Hiland claims that he was not deliberately indifferent, and that he cannot be held liable under a theory of supervisory liability. Additionally, Hiland argues that because he is entitled to summary Judgment on both Pfeifer's federal claims, this Court must also dismiss Pfeifer's remaining state law claims.

### A. Hiland is Entitled to Summary Judgment on Pfeifer's Deliberate Indifference Claim.

Arguing that Pfeifer can satisfy neither the objective nor the subjective component of a deliberate indifference claim, Hiland moves for summary judgment. According to Hiland, the fact that he was on vacation is the "linchpin," and "[p]laintiff's case falls apart without a showing of direct involvement." (R. 26). Pfeifer responds claiming that there is "abundant evidence that Dr. Hiland was deliberately indifferent to Mr. Embry's Serious medical needs," and the fact that Hiland was on vacation does not absolve him from his duties as KSP Physician Chief. Without completely agreeing with Hiland's argument, the Court nevertheless finds that he is entitled to summary judgment, on certain claims.

"A prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment." *Farmer v. Brennan*, 511 U.S. 825, 828, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994) (citations omitted). While "[t]he Constitution does not mandate comfortable prisons," the United States' founding document does not "permit inhumane ones [either], and it is now settled that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Id.* at 832 (internal citations omitted). Relevant to this case, the Eighth Amendment "imposes duties on...officials, who must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and *medical care*, and must 'take

reasonable measures to guarantee the safety of the inmates.'" *Id.* (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-27, 104 S. Ct. 3194, 82 L. Ed. 2d 393 (1984) (emphasis added)).

"An Eighth Amendment claim has an objective component and a subjective component." *Santiago v. Ringle*, 734 F.3d 585, 590 (6th Cir. 2013) (citing *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001)). First, "[t]he objective component requires a plaintiff to prove a 'sufficiently serious' medical need, and, [second], the subjective component requires a plaintiff to prove that the [medical professionals] had a 'sufficiently culpable state of mind.'" *Id.* (quoting *Farmer*, 511 U.S. at 834). With respect to the objective component, a "sufficiently serious medical need...is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Id.* (internal citations omitted). And "[i]f the plaintiff's claim...is based on the prison's failure to treat a condition adequately, or where the prisoner's affliction is seemingly minor or non-obvious,...the plaintiff must place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment." *Id.* (internal citations omitted).

"The subjective component requires a plaintiff to prove that the doctors had a 'sufficiently culpable state of mind,' equivalent to criminal recklessness." *Id.* at 591 (quoting *Farmer*, 511 U.S. at 834, 839-40). In order "[t]o be liable, the doctors need not act for the very purpose of causing harm or with knowledge that harm will result,...but they must act with more than mere negligence." *Id.* (internal citations omitted). "For example, '[w]hen a prison doctor provides treatment, albeit carelessly or inefficaciously, to a prisoner, he has not displayed a deliberate indifference to the prisoner's needs, but merely a degree of incompetence which does not rise to the level of a constitutional violation.'" *Id.* (quoting *Comstock*, 273 F.3d at 703). "An official is deliberately indifferent where she (1) 'subjectively perceived facts from which to infer

7

substantial risk to the prisoner,' (2) 'did in fact draw the inference,' and (3) 'then disregarded that risk.'" *Id.* (quoting *Comstock*, 273 F.3d at 703).

Turning to the situation at hand, the Court notes that Embry's death highlights what may be systemic failures within KSP, as alleged by Pfeifer and recognized by the Department of Corrections in its own Critical Incident Report prepared after Embry's death. However, Pfeifer brings suit against Hiland in his individual capacity. Therefore, as Hiland correctly points out, the Court must focus its attention only on Dr. Hiland's individual actions to determine whether he was deliberately indifferent. *See Gibson v. Mathews*, 925 F. 2d 523, 535. ("Although it may appear from the facts that Gibson was a victim of the bureaucracy as a whole . . . [i]f any one [defendant] is to be held liable, it must be based on the actions of that defendant in the situation that the defendant faced . . . ."). This is especially true concerning whether Pfeifer has satisfied the subjective component of his deliberate indifference claim. *See Garretson v. City of Madison Heights*, 407 F.3d 789, 797 (6th Cir. 2005) ("[T]he subjective component of a deliberate indifference claim must be addressed for each [defendant] individually."). In so doing, the Court finds that while Embry arguably presented sufficiently serious medical needs, no reasonable juror could find Hiland's mind state sufficient to satisfy a deliberate indifference claim's subjective component.

Contrary to Hiland's argument, Embry indeed presented sufficiently serious medical need. In fact, Embry arguably suffered from two distinct, yet correlated, sufficiently serious medical needs—the unaddressed mental illness that caused him to stop eating and drinking, and the consequent dehydration and starvation that took Embry's life. *See Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001) (noting that a "prison inmate has [an] Eighth Amendment right [to] be free from deliberate indifference to serious psychiatric needs."); *Gibson v. Moskowitz*, 523

8

F.3d 657, 662 (6th Cir. 2008) (holding that a reasonable jury could find severe dehydration to pose a sufficiently serious medical risk).

However, to the extent that Hiland was even aware of these serious medical needs, he understood other licensed medical professionals—not himself—to be responsible for their treatment. First, assuming that Hiland knew that Embry was suffering from mental illness, which is a large assumption, treatment would have been provided by the mental health professionals at KSP—a distinct and separate team from the medical health team of which Hiland was a part. In fact, the Record reflects that Hiland had effectively never communicated with the mental health team at KSP. (R. 224, Ex. 4, Hiland Depo., p. 53). While such a lack of communication might rise to the level of negligence, it certainly does not rise to a level beyond it, as required by deliberate indifference. Furthermore, a physician's reliance on a mental health professional to treat their patient for mental illness while the physician concentrates only on that patient's bodily ailments can be no more properly characterized as deliberate indifference than could be a firefighter trying to put out a blaze while relying on the police officer to catch the arsonist who started it. In other words, it would be improper to characterize Hiland as deliberately indifferent for assuming that Embry's mental health needs would be addressed by the mental health professionals treating him at KSP. Hiland did not callously ignore a risk as would be required by deliberate indifference—he simply left the risk to those most qualified to attend to it.

Moreover, this is all assuming that Hiland was apprised of Embry's mental health. Hiland claims, that he did not treat Embry, and nothing suggest otherwise. (R. 269, Hiland Depo., p. 191). Hiland also claims he never communicated with any mental health professionals at KSP. (R. 269, Hiland Depo., p.187). Nor, according to Hiland, did he read their medical notes. (R. 269, Hiland Depo., pp. 184-185). The only evidence suggesting that Hiland might have known

about Embry's poor mental health is a December 2013 medical note entered by a nurse. (*See* R. 224-1, Ex. 1, Embry's Med. R.). The note stated that Dr. Hiland was notified Embry had inflicted harm upon himself by superficially scratching his own right forearm with a plastic spork. (*Id.*). Knowledge of such behavior could arguably be construed as putting Hiland on notice that Embry was suffering from some mental affliction. However, the fact remains that nothing in the Record suggests it was Hiland's responsibility to treat Embry's mental health. Nor is there any evidence suggesting that Hiland had reason to believe the mental health professionals at KSP would fail to adequately treat Embry's mental ailments, should he have any. Thus, there is no evidence that Hiland perceived Embry to be at risk from his poor mental health. While failure to perceive a risk may be negligent it is not deliberately indifferent. Without being aware that Embry was at risk, Hiland was incapable of being deliberately indifferent as a matter of law. *See Ruster v. County of Saginaw*, 749 F.3d 437, 447 (6th Cir. 2014) (noting that plaintiff must prove subjective knowledge).

Next the Court turns to Embry's dehydration and starvation. Unlike Embry's mental illness, these physical ailments would have fallen directly within Dr. Hiland's purview. As Chief Physician, and as the only physician at KSP, he was responsible for "looking after the health of the general [inmate] population." (R. 224, Ex. 4, Hiland Depo., pp. 18-20). Also unlike Embry's mental illness, Dr. Hiland was indisputably aware of Embry's emergent physical condition.[1] Hiland signed off on Nurse Royster's January 4, 2014 medical note, which read:

> [Embry] states that he is weak and shaky. [Embry] appears pale and extremities shake. Advised [Embry] that best plan of action would be to resume eating. [Embry] states that

---

[1] While there is evidence in the Record which would suggest that Hiland became aware of Embry's potential dehydration and starvation on the January 4, 2014, there is nothing in the record that would indicate he was aware of it prior to that date. Although Embry had started skipping meals long before January 4, Hiland was not the person who would have been notified. Per Kentucky Department of Corrections policy, only the Institutional Health Authority was required to be notified that an inmate was on hunger strike or skipping meals. Nurse Practitioner Wilkinson was the Institutional Health Authority at KSP starting on December 11, 2013—not Hiland. There is no evidence which suggests those aware that Embry was skipping meals ever reported such occurrences to Dr. Hiland.

he thinks it has been too long to resume now. Weight is 138, last recorded weight 9/26/13 of 170. This is a loss of 32 lbs. Will recheck weight and notify provider. [Embry] is also tachycardic. Unable to check b/p d/t.

According to Plaintiff's expert, Dr. Sondra Cosby, from this note it "should have been obvious to KSP clinicians, including Dr. Hiland and Nurse Practitioner Wilkinson, that Mr. Embry was suffering from severe dehydration and malnutrition that without medical intervention would lead to imminent death." (R. 224, Ex. 10, Crosby Report, p. 11).

However, Dr. Hiland was on vacation a full day before signing off on Royster's note. Furthermore, Dr. Hiland *co-signed* the note with Nurse Practitioner Wilkinson, who was, as everyone understood, the final stop on Embry's medical care while Hiland was on vacation. It was not customary, nor was it expected, for KSP employees, including Hiland to work on vacation. Put simply, at KSP, "[g]enerally speaking, if a person's on vacation, they're on vacation." (R. 207, Ex. 18, Pettit Depo., p. 114). If Hiland was not responsible for Embry's care on vacation, which the evidence makes clear, then the question becomes: was Hiland deliberately indifferent for not making further inquiry in response to Royster's note so as to ensure that Nurse Practitioner Wilkinson's treatment was appropriate? The answer is no. Hiland had no reason to believe that Nurse Practitioner Wilkinson was not going to treat Embry adequately. A doctor has no duty to investigate further, after they have reason to believe a patient has been, or is being, adequately treated. *See Winkler v. Madison Cty.*, 893 F.3d 877, 893 (6th Cir. 2018) (holding that a doctor's failure to investigate further, after he believed the patient to be adequately treated did not constitute deliberate indifference, though it may have constituted negligence).

Contrary to Pfeifer's instance otehwise, none of the "abundant evidence"—when considered in conjunction with the fact that Hiland was on vacation, not responsible for Embry's psychological health, and unaware of Embry's meal-skipping—supports a reasonable conclusion

that Hiland was deliberately indifferent. Take for example, Hiland admitting that Embry's heart rate was elevated on January 4, 2014, which signals dehydration. Pfeifer claims that such an admission suggest that Hiland was deliberately indifferent. Pfeifer would be correct if Hiland was responsible for treating Embry. Such an admission would prove that Hiland ignored a risk by failing to treat Embry for dehydration, even though he recognized its symptoms. However, when considered in conjunction with the fact that Wilkinson—not Hiland—was responsible for Embry's treatment, such an admission no longer supports the conclusion that Hiland was deliberately indifferent. Instead, it simply suggests the Hiland knew that Embry needed treatment, which he assumed would be provided by Wilkinson. As already explained, the assumption that a trained and licensed medical professional will adequately discharge their duties is not deliberate indifference. Every other piece of evidence pointed to by Pfeifer suffers from the same deficiency as revealed above. The pieces of evidence examined on their own may suggest that Dr. Hiland was deliberately indifferent. But when properly examined in combination with the fact that Hiland was not responsible for Embery's psychological care nor his physical care, at least while he was on vacation, the evidence no longer reasonably supports deliberate indifference. Thus, the Court must grant summary judgment in Hiland's favor on Pfiefer's deliberate indifference claim.

**B. Hiland is Not Entitled to Summary Judgment on Pfeifer's Supervisory Liability Claim.**

Hiland claims he is entitled to Summary judgment on Pfeifer's Supervisory liability claim for three reasons: First, Hiland was not a supervisor. Second, even if Hiland was a supervisor, his subordinates did not engage in unconstitutional conduct. Third, Hiland did not specifically direct or encourage others to violate Embry's rights. Pfeifer responds, arguing that Hiland indeed supervised the KSP nursing staff, and that Hiland implicitly authorized, approved, or knowingly

acquiesced in the conduct that led to Embry's death. The Court finds the issue of Supervisory Liability best left for the jury.

The theory of supervisory liability under 42 U.S.C. § 1983 permits supervisors to be held liable for their subordinates' unconstitutional conduct. *Casey v. Sanders*, No. 7:17-CV-145-KKC, 2018 U.S. Dist. LEXIS 103949, at *16 (E.D. Ky. June 21, 2018). However, it is well settled law that "[g]overnment officials may not be held liable for the unconstitutional behavior of their subordinates under the theory of respondeat superior." *Iqbal*, 556 U.S. at 676. Thus, supervisory liability is applicable only to limited circumstances in which the plaintiff has established three things: (1) unconstitutional conduct on behalf of the subordinate; (2) "active unconstitutional behavior" on behalf of the supervisor; and (3) a "causal connection between the defendant's wrongful conduct and the violation alleged." *McQueen v. Beecher Cmty. Sch.*, 433 F.3d 460, 470 (6th Cir. 2006) (holding unconstitutional conduct on behalf of the subordinate to be a prerequisite of supervisory liability under § 1983); *Bass v. Robinson*, 167 F.3d 1041, 1048 (6th Cir. 1999) (holding that a supervisor must be actively engaged in the subordinate's unconstitutional behavior); *Peatross v. City of Memphis*, 818 F.3d 233, 241 (6th Cir. 2016) (finding there must be a causal connection between the supervisor's conduct and the subordinate's unconstitutional behavior).

First, contrary to Hiland's position, the Court finds there to be a dispute of fact as to whether he had supervisory authority over the KSP nurses. While Hiland's job description and the KSP organizational chart both indicate that Hiland had no supervisory responsibilities, Nurse Bauer testified that he believed Hiland "to be someone who supervised the medicine he practiced at KSP."(R. 224, Ex. 6, Bauer Depo. p. 14). Furthermore, both Bauer and Licensed Practical Nurse Secoy, who also practiced at KSP, testified that Hiland issued rules which they felt they

had to follow or suffer employment related consequences. (*Id.* at p. 24; R 224, Ex. 7, Secoy Depo. p. 120). As such, there remains a genuine factual dispute as to whether Hiland supervised the KSP nursing Staff. Therefore, Hiland is not entitled to summary judgment on the basis that he was not a supervisor.

Next, the Court turns to whether there is sufficient evidence from which the jury could find that Hiland's subordinates violated Embry's constitutional rights. As discussed above, only the KSP nursing staff could have arguably been considered Hiland's subordinates. Frankly, Pfeifer's argument is underdeveloped here. Nevertheless, Nurse Royster and Nurse Bauer were both directly involved at some point with Embry's care. Embry essentially starved and dehydrated to death within days and hours of these nurse's actions regarding his care, or lack thereof. Moreover, there is evidence to suggest that the nursing staff as a whole complied with the so called "tea-rule," and that the nursing staff as a whole knowingly failed to comply with KSP's policy regarding inmates determined to be on hunger-strike. (R. 224, Ex. 6, Bauer Depo. p. 24; R. 224, Ex. 7, Secoy Depo. 120-121). In fact, there is evidence to suggest specifically that Bauer might have invoked the "tea-rule" concerning Embry's care the day he died. Additionally, there is evidence that on January 4, 2014—just 9 days before Embry died—Royster specifically did not comply with KSP's standing order regarding inmates determined to be on hunger strike. From this evidence, the Court concludes that it is not beyond the realm of possibility that a reasonable jury might find that Royster and Bauer were deliberately indifferent to Embry's serious medical need in violation of his Eighth Amendment rights. Therefore, for the purposes of summary judgment, and at this stage of the procedure the Court believes there is evidence that Hiland's subordinates engaged in unconstitutional conduct. The Court can better determine this at the close of all the evidence.

14

The Court also finds that Hiland was sufficiently involved in the KSP nursing staff's potentially unconstitutional conduct, so as to be culpable under a theory of supervisory liability. Hiland argues that he was on vacation at the time of Embry's death, and that the consequent lack of direct involvement is the "linchpin"in this case: If Hiland had no direct involvement he cannot be said to have actively participated in or encouraged the unconstitutional conduct as required to establish supervisory liability. Hiland's argument espouse a misunderstanding of supervisory liability and its evolution.

Hiland is correct, Supervisory liability does require active behavior. However, "active behavior does not mean active in the sense that the supervisor must have physically put his hands on the injured party *or even physically been present at the time of the constitutional violation*." *Peatross v. City of Memphis*, 818 F.3d 233, 242 (6th Cir. 2016) (internal citations omitted) (emphasis added). As such, Hiland's vacation is not dispositive, and by no means the "linchpin"Hiland makes it out to be. Nor is the fact that that Hiland was not directly responsible for Embry's care. Pfeifer must only show that Hiland "implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending [subordinates]." *See Phillips v. Roane Cty.*, 534 F.3d 531, 543 (6th Cir. 2008). Evidence suggesting that a supervisor made, encouraged, or promulgated a policy or custom, which ultimately caused the subordinates to deprive the plaintiff of his constitutional rights, would constitute such a showing. *Dodds v. Richardson*, 614 F.3d 1185, 1195 (10th Cir. 2010) (citing *Meade v. Grubbs*, 841 F.2d 1512, 1528 (10th Cir. 1988) (A defendant-supervisor's promulgation, creation, implementation, or utilization of a policy that caused a deprivation of plaintiff's rights also could have constituted sufficient personal involvement.)).

Pfeifer has produced such evidence here. There is testimony from KSP health professionals that Hiland created and promulgated the "tea-rule" as well as the unwritten policy that the KSP nursing staff was not to comply with the KSP standing order concerning inmates determined to be on hunger-strike. (R. 224, Ex. 6, Bauer Depo., pp. 24, 62, 140; R. 224, Ex. 7, Secoy Depo., pp. 120-121; R. 224, Ex. 13, Wilkinson Depo., pp. 82, 89-90). These policies have been called "absurd" and "dangerous" by other medical professionals. (R. 224 Ex. 8, Crosby Depo., p. 150; R. 224, Crall Depo. Ex. 5. pp. 113-114). Moreover, there is evidence to suggest that had they not been in place and followed by the KSP nursing staff, Embry might have received life saving care. (R. 224, Crosby Report., p. 12). Thus, the Court finds that a reasonable jury could infer from the evidence that the policies and customs created and encouraged by Dr. Hiland directly caused and contributed to the KSP nursing staff's deliberate indifference towards Embry's serious medical need. Therefore, summary judgment in Hiland's favor on Pfeifer's Supervisory Liability claim is denied.

### C. Hiland's Argument for Dismissing Pfeifer's State Law Claims Is Moot.

Hiland's only argument for dismissing Pfiefer's state law claims is premised on the federal claims' dismissal. With its refusal to grant Hiland summary judgment on the 42 U.S.C. § 1983 supervisory liability claim, the Court moots Hiland's argument for dismissing the state law claims. Hiland's state law claims will proceed to trial before the court as scheduled, along with his supervisory liability claim.

## CONCLUSION

Many of the conclusions contained in this Opinion reflect close calls. Arguments by counsel, while well done, concentrate on evidence favorable to that party. This is not unusual.

However, in so doing, often conflicting evidence is not referenced. As such, full development of the facts a trial should shed more light on this very factual dispute.

For the reasons stated above, it is **HEREBY ORDERD** that Defendant Dr. Steven Hiland's Motion for Summary Judgment, (R. 207), is **DENIED IN PART and GRANTED IN PART**. The Court grants summary judgment in Hiland's favor on the Plaintiff Mark Pfeifer's Eighth Amendment deliberate indifference claim. Pfeifer's remaining claims against Hiland shall proceed to trial as scheduled.

**IT IS SO ORDERED.**

*Thomas B. Russell*

**Thomas B. Russell, Senior Judge**
**United States District Court**

April 20, 2019

cc: Counsel of Record